JACK D. CAMPBELL
Attorney at Law
Nevada State Bar #4938
418 River Flow Ct.
Reno, NV 89523
(775) 219-6699
*Attorney for Plaintiffs Apryl McElroy and Jessica Troup*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| APRYL MCELROY AND JESSICA TROUP,<br><br>Plaintiffs,<br><br>vs.<br><br>RENO POLICE SERGEANT PAUL D. SIFRE (RET.), an individual and in his capacity as an employee of CITY OF RENO, RENO CHIEF OF POLICE JASON D. SOTO (RET.), an individual and in his capacity as an employee of the CITY OF RENO, CITY OF RENO, a municipal corporation organized and existing under the laws of the state of Nevada, and its division the CITY OF RENO POLICE DEPARTMENT, a Nevada law enforcement agency, and Does 1 through 20, inclusive,<br><br>Defendants.             / | CASE NO.:   3:23-cv-451<br><br>**COMPLAINT**<br>**JURY DEMAND** |

Plaintiffs APRYL MCELROY and JESSICAL TROUP, by and through their attorney, Jack D Campbell, Attorney at Law, alleges and complains as follows for their claims against Defendants POLICE SERGEANT PAUL D. SIFRE (RET.), RENO CHIEF OF POLICE JASON D. SOTO (RET.) CITY OF RENO a municipal corporation; and its division, the RENO POLICE DEPARTMENT, a Nevada law enforcement agency and DOES 1 through 20:

///

## NATURE OF ACTION

MCELROY and TROUP allege that Defendants PAUL SIFRE, JASON SOTO, CITY OF RENO, and CITY OF RENO POLICE DEPARTMENT violated their rights established by Title VII of the Civil Rights Act of 1964 which prohibits discrimination based on race, color, religion, sex and national origin when JASON SOTO, CITY OF RENO AND CITY OF RENO POLICE DEPARTMENT negligently and improperly retained and failed to train SIFRE and put him in a supervisory position knowing that he had several previous disciplinary actions brought against him for discrimination and harassment.  SIFRE then used his position of authority over MCELROY and TROUP to intimidate, threaten, sexually harass and create a hostile work environment for both MCELROY and TROUP who were his subordinates at the time of the incidents.  CITY OF RENO, SOTO and DOES 1-20, established a custom, pattern and practice of lax to non-existent personnel management, supervision and discipline practices that violated CITY OF RENO Charter, policies, procedures, in addition to state and federal laws, regulations, rules and generally accepted industry standards.  These acts were done with deliberate indifference as to the injuries, damages and abuses that would occur from their intentional violations and failures when hiring, training, supervising and retaining SOTO and SIFRE and these intentional acts were the direct and proximate causes of the sexual harassment and hostile work environment suffered by MCELROY and TROUP in violation of 42 U.S.C. §2000e, *et seq.* as alleged herein.

## JURISDICTION AND VENUE

1. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 because this matter involves a federal question.  This matter is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* This Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. §1367(a).

2. Venue is proper in this District in accordance with 28 U.S.C. §1391(b) because CITY OF RENO is a municipal corporation formed and governed by Nevada law and a resident of Washoe County, Nevada.  In addition, all material acts complained of herein occurred within this District in the State of Nevada.

///

///

## ADMINSTRATIVE PROCESS

3. MCELROY and TROUP each filed timely complaints against the Defendants named herein with the Nevada Equal Rights Commission on March 8, 2023. Attempts to resolve this matter through the administrative process failed and the Plaintiffs were given Right to Sue Letters on July 18, 2023. Accordingly, this complaint is properly and timely filed herein.

## PARTIES

4. MCELROY was and is a citizen of the United States residing in Washoe County, Nevada, and, at all times relevant herein, was an employee of University of Nevada, Reno Police Department or Washoe County District Attorney's Office.

5. TROUP was and is a citizen of the United States residing in Washoe County, Nevada, and, at all times relevant herein, was an employee of Washoe County Sheriff's Department.

6. SIFRE was and is a citizen of the United States residing in Washoe County, Nevada, and, at all times relevant herein, was an employee of Defendant CITY OF RENO, employed as a police officer acting under the color of law, was acting within the course and scope of his employment, and in accordance with his assigned duties.

7. SOTO was and is a citizen of the United States residing in Washoe County, Nevada, and, at all times relevant herein, was an employee of Defendant CITY OF RENO employed as a police officer acting under the color of law, was acting within the course and scope of his employment, and in accordance with his assigned duties.

8. CITY OF RENO was and is a municipal corporation formed and governed by the laws of Nevada and is a resident of Washoe County, Nevada.

9. CITY OF RENO was and is an "Employer" as defined by 29 U.S.C. §2611 (4)(A), and a "Public Agency" as defined in 29 U.S.C. §2611(4)(A)(iii).

10. CITY OF RENO POLICE DEPARTMENT was and is a division of the CITY OF RENO, a law enforcement agency pursuant to NRS 289.010, governed by the laws of Nevada and is a resident of Washoe County, Nevada.

11. At all times relevant herein, DOE defendants 1 through 20, are or were police officers, public officials, appointees, agents, employees, servants, and/or joint venturers of CITY OF RENO who were acting within the course and scope of their employment or agency engaged in acts in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, state law, and/or common law as alleged herein and legally and proximately caused some or all of the damages identified herein. DOE POLICE OFFICERS and PUBLIC OFFICIALS were deliberately indifferent as to the risk of injuries and damages that could be caused by their failure to properly hire, train, supervise, and discipline SOTO and SIFRE as alleged herein. MCELROY AND TROUP are currently ignorant of the true identities of these Parties, and therefore, sues these Defendants by fictitious names DOES 1 through 20. MCELROY AND TROUP will amend this Complaint to allege the true names, acts, and capacities of these Defendants as soon as they are ascertained.

12. CITY OF RENO participated, directed, approved, ratified, and condoned the acts complained of herein, and therefore is liable for all acts of its individual members, elected officials, appointees, agents, employees, and servants, through *Respondeat Superior,* agency, or as joint venturers.

**FACTUAL ALLEGATIONS**

13. MCELROY began her career as a University of Reno Nevada Police Officer (UNR) when she was hired as a Patrol Officer by UNR on or about February 2015.

14. MCELROY was awarded a placement on the Regional Special Enforcement Team (SET) on or about January 2018 as a detective. SET was later consolidated into the Regional Narcotics Unit (RNU).

15. Following the acts of the Defendants alleged herein, MCELROY left the RNU and took employment with Washoe County District Attorney's Office.

16. TROUP began her career as a Deputy for the Washoe County Sherriff's Department on or about September 2007.

17. TROUP was awarded a placement on the All Threats All Crimes team (ATAC) on or about October 2017 as a detective.

18. The ATAC team was later consolidated into the RNU as well.

19. The Regional Narcotics Unit (RNU) is a regional task force unit of Nevada's High Intensity Drug Trafficking Areas teams. This high exposure unit is comprised of detectives from the Reno Police Department, the Sparks Police Department, the Washoe County Sheriff's Office and the University of Nevada Police Department. This unit is supervised by the Reno Police Department and Washoe County Sherriff's Office. RNU is responsible for street-level narcotics complaints and operations, alcohol compliance checks as well as prostitution complaints and operations throughout Washoe County. Additionally, the RNU assists all partnering agencies with various ongoing cases when requested.

20. On September 26, 2021, the RNU, including both MCELROY and TROUP, attended the Nevada Narcotics Officers Association weeklong conference in Las Vegas, Nevada.

21. MCELROY arrived later than everyone else in her unit, so she met up with TROUP at the hotel in order to get her room key because they were sharing a room during the conference. MCELROY and TROUP were the only two female detectives on the RNU at the time of this conference.

22. On the way to her room, MCELROY and Det. Nate Janning, also a member of the RNU, ran into SIFRE and his brother by the elevators of the hotel. SIFRE asked MCELROY if she had gotten checked in to which MCELROY explained that she had received her room key from TROUP.

23. During this conversation, SIFRE made a comment to MCELROY that TROUP likes to "eat out other women" and that TROUP had told him she had done this with another woman. MCELROY felt this comment was outrageous, insulting and demeaning. MCELROY was stunned that a superior officer would say something like this to her. The whole situation made MCELROY very uncomfortable, especially because she was eight weeks pregnant with her first child at the time and this was said in front of her peers and other law enforcement officers.

24. Shortly after the comment was made, SIFRE invited himself and his brother to join MCELROY and Det. Janning for dinner. During dinner SIFRE again directed the conversation to a sexual nature and asked MCELROY if she and TROUP were going to

"scissor" in bed that night since they were sharing a room.  This question served to make MCELROY even more uncomfortable around SIFRE, so she promptly excused herself from the table as soon as she was done eating.

25. Later that same night, MCELROY discussed the comments with TROUP when they were in their hotel room. MCELROY asked TROUP if she had ever told SIFRE about any sexual exploits which TROUP vehemently denied.  The whole situation enraged TROUP and made her very uncomfortable because she felt the comments were made to demean and objectify her and MCELROY.

26. The next day as everyone was leaving the training room for a lunch break, SIFRE walked up behind MCELROY and patted her condescendingly on the top of the head.  This action made MCELROY feel as though SIFRE was trying to intimidate her and make her feel powerless around SIFRE. Even her fellow detectives who witnessed the incident made comments about how inappropriate SIFRE's actions were.  MCELROY voiced her concerns about feeling uncomfortable to her fellow detectives and they fell in line behind her in order to shield her from any further uncomfortable and unwanted touching from SIFRE.

27. The RNU made reservations for dinner for the entire group that same night at a restaurant in the casino where the training was being held. When MCELROY and TROUP arrived at the restaurant the only seating available was at the same table that Sifre was seated.  When MCELROY and TROUP walked up to the table SIFRE looked at both of them and made a gesture with both of his hands as though they were two pairs of scissors crossing into each other and raised his eyebrows as if to ask the question "well did you?".  These acts were done in front of other members of the RNU and were insulting, demeaning, and were intended to sexually harass both MCELROY and TROUP.

28. MCELROY became very angry and even more uncomfortable and left the area to find a seat at another table away from SIFRE.

29. TROUP stayed back and told SIFRE that his comments and actions were completely uncalled for and demeaning, and it was not ok for him to act that way.

30. TROUP reported the incidents to her direct sergeant, Sergeant Kevin Krush.

31. MCELROY received a phone call from her direct supervisor, Sergeant Krush, asking about the incidents as she was traveling home. Sergeant Krush asked MCELROY to meet with a Washoe County Lieutenant and Reno Police Commander Zachary Thew when she returned to work following the training.

32. Shortly thereafter SIFRE was removed from RNU and given a no contact order by his superiors stating that he was prevented from contacting or talking to MCELROY or TROUP in any way.

33. Approximately 1 to 2 weeks after SIFRE received the no contact order, the RNU was conducting a large operation and MCELROY was assigned to be available at the RNU offices, by herself, to coordinate any unforeseen circumstances for the operation.

34. When she arrived at the RNU offices around 12:30pm that day, MCELROY noticed that the door to Sgt. Krush and SIFRE's office was open, which was highly unusual, so she closed it.

35. After the operation was completed the rest of RNU came back to the offices, Sgt. Krush asked who was playing a joke on him by closing the door to his office with a broken key in it. MCELROY said that she had closed it but did not know the key had been broken off in the lock.

36. After some investigation, it was discovered that SIFRE had been there earlier that day, around noon, and was allowed *unescorted* into the RNU offices to get his personal effects from the office he had shared with Sgt. Krush before being removed from the RNU.

37. This information made MCELROY very upset because she was scared that SIFRE would retaliate against her for reporting the incident during training and that the RENO POLICE DEPARTMENT let him wander around the RNU offices without an escort shortly before she was in the offices by herself.

38. During his assignment to the RNU, SIFRE repeatedly bragged to the other members of RNU that he had been investigated by RENO POLICE DEPARTMENT's Internal Affairs Department more than a dozen times and was never punished or disciplined because of his close relationship with Police Chief SOTO. This information made MCELROY feel even

Jack D Campbell
*Attorney at Law*
418 River Flow Ct.
Reno, NV 89523

more vulnerable because SIFRE was allowed to act as he wanted without fear of punishment or control.

39. Upon information and belief (because all records surrounding these numerous IA investigations are in the sole custody and possession of RENO), SIFRE's numerous IA investigations involve confirmed and sustained complaints involving racial profiling, excessive force, sexual misconduct, sexual harassment, timecard fraud, insubordination and other code of conduct allegations.

40. Because of the long list of complaints and IA investigations, RENO had a duty to identify SIFRE through its Early Warning System, assign additional supervision, require additional training and counseling and to apply reasonable disciplinary policies and procedures, including terminating SIFRE's employment as a RENO Police Officer.

41. Throughout SIFRE's career as a Reno Police Officer numerous and repeated incidents occurred requiring RENO to identify SIFRE as an officer with "problematic behavior" and subjected him to increased supervision, training, counseling, discipline and/or termination.

42. RENO breached those duties by failing to properly supervise SIFRE, by failing to properly train him to stop the re-occurring misconduct and by negligently retaining SIFRE as a police officer.

43. Because of SIFRE's long history of misconduct and "problematic behavior", RENO had a duty not to assign SIFRE to any high-profile assignments pursuant to NRS 29.823.  RENO breached that duty when it assigned SIFRE to be the RDP Sergeant in charge of the RNU.

44. Following the reporting of SIFRE'S sexual harassment, RENO, through the RPD Internal Affairs Division, conducted an investigation and confirmed that SIFRE had engaged in improper and illegal sexual harassment which created a hostile work environment for both MCELROY and TROUP.  Nevertheless, SOTO, RENO, and RPD intentionally delayed the completion of the Internal Affairs investigation to allow SIFRE to enjoy a contractual increase of benefits and facilitated SIFRE obtaining a medical disability retirement which provides greater retirement benefits that SIFRE'S performance and tenure earned.  **SOTO, RENO, and RPD, pursuant to their improper custom, pattern, and practice DID NOT discipline SIFRE for the conduct alleged herein.**

## FIRST CAUSE OF ACTION

**(Title VII of the 1964 Civil Right Act)**

**42 U.S.C §2000e**

**Sexual Harassment and Discrimination**

45. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 44, above, as if stated herein verbatim.

46. SIFRE's sexually graphic comments and gestures were outrageous, severe and created a work environment that was intimidating, hostile, and offensive to MCELROY and TROUP.

47. SIFRE's acts of sexual harassment were intentional, malicious, outrageous and were meant to harass, intimidate, threaten, demean, insult and harm MCELROY and TROUP.

48. SIFRE's acts caused MCELROY and TROUP to suffer embarrassment, stress, mental anguish, emotional pain and suffering and loss of enjoyment of work activities.

49. The Defendants acts violated Title VII of the Civil Rights Act of 1964 and were the direct and proximate cause of the injuries and damages alleged herein in excess of $75,000, the actual amount to be determined at trial.

50. In addition to an award for damages proven herein, MCELROY and TROUP are due an award of reasonable attorney's fees and costs in accordance with 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION

**(Custom, Pattern and Practice)**

51. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 50, above, as if stated here in verbatim.

52. SOTO, upon obtaining the rank of Chief of Police, established a custom, pattern and practice at RPD of not following state law, federal regulations, administrative code, CITY OF RENO Charter, policies, procedures, or generally accepted industry standards as they apply to his supervision, control and discipline and retention of members of RPD.

53. SOTO's and RPD's custom, pattern and practice of lenient to non-existent discipline for misconduct of RDP officers created an environment where RPD officers felt free and immune to engage in misconduct without reprisal.

54. SIFRE repeatedly bragged to the RNU about SOTO'S practice of not disciplining him for his misconduct even though he had been referred to the Internal Affairs Department more than a dozen times, which included other incidents of sexual harassment and the creation of a hostile work environment.

55. SOTO's and RPD's custom, pattern and practice created the environment where SIFRE was allowed to engage in repeated acts of sexual harassment and misconduct without fear of discipline and directly and proximately caused the Title VII violations alleged herein.

56. The Defendants' acts violated Title VII of the Civil Rights Act of 1964 and were the direct and proximate cause of the injuries and damages alleged herein in excess of $75,000, the actual amount to be determined at trial.

57. In addition to an award for damages proven herein, MCELROY and TROUP are due an award of reasonable attorney's fees and costs in accordance with 42 U.S.C. §1988.

### THIRD CAUSE OF ACTION

### (Deliberate Indifference)

58. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 57, above, as if stated herein verbatim.

59. SOTO intentionally violated CITY OF RENO policies as well as state and federal law when he retained SIFRE as a sergeant with RPD. SOTO was deliberately indifferent as to the injuries and damages that could or would result from SIFRE's retention as a police officer with RPD.

60. RENO and SOTO's acts of assigning SIFRE to be in a position of authority over MCELROY and TROUP were intentional and done with deliberate indifference as to the injury and harm that would occur from such an assignment.

61. But for RENO's and SOTO's acts, SIFRE would not have been in a position of authority to sexually harass MCELROY and TROUP.

62. The Defendants acts violated Title VII of the Civil Rights Act of 1964 and were the direct and proximate cause of the injuries and damages alleged herein in excess of $75,000, the actual amount to be determined at trial.

63. In addition to an award for damages proven herein, MCELROY and TROUP are due an award of reasonable attorney's fees and costs in accordance with 42 U.S.C. §1988.

## STATE BASED CLAIMS

## FOURTH CAUSE OF ACTION

### (Respondeat Superior)

64. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 63, above, as if stated herein verbatim.

65. Reno is an "Employer" as defined herein, and, at all times relevant herein, was the Employer of Defendants SIFRE, SOTO and DOE Peace Officers 1-10. These defendants were employed by RENO as Peace Officers as defined in NRS 289.010 and were acting within the course and scope of their employment and pursuant to their assigned duties.

66. RENO is liable and responsible for the acts and omissions of Defendants SIFRE, SOTO, DOE Peace Officers 1-10 and DOE Public Officers 11-20 by way of Respondeat Superior.

67. Pursuant to NRS 41.031, RENO waives sovereign immunity for acts and omissions of Defendants SIFRE, SOTO, DOE Peace Officers 1-X and DOE Public Officers XI- XX.

68. Pursuant to NRS 41.138, because RENO and SOTO assigned SIFRE to the high exposure position of the RDP Sergeant in charge of day-to-day operations of the Regional Narcotics Unit, RENO and SOTO made SIFRE a "Person in a position of authority" over Plaintiffs MCELROY and TROUP.

69. Therefore, RENO is liable and responsible by way of Respondeat Superior for all damages caused by SIFRE's illegal sexual harassment of MCELROY and TROUP, with the exact amount to be proven at trial.

///

///

## FIFTH CAUSE OF ACTION

### (Negligent Supervision, Training and Retention)

70. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 69, above, as if stated herein verbatim.

71. In addition to RENO being a political subdivision of the State of Nevada and the employer of all Defendants named herein, RENO, by and through the actions of the RENO POLICE DEPARTMENT, is a "Law Enforcement Agency" as defined by NRS 289.010(2).

72. As a Law Enforcement Agency, RENO is required to adopt policies and procedures for the investigation of complaints and allegations of misconduct of the peace officers employed by RENO.

73. As a Law Enforcement Agency, RENO is required to establish an early warning system to identify peace officers who display bias indicators or other problematic behavior. Once identified, RENO has a non-delegable duty to increase supervision of the peace officer and to provide additional training and counseling to the peace officer as required by NRS 289.823.

74. RENO's breach facilitated SIRFI's sexual harassment and discrimination of MCELROY and TROUP causing damages in excess of $75,000, the exact amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### (Punitive Damages)

75. MCELROY and TROUP re-allege and incorporate all allegations made in Paragraphs 1 through 74, above, as if stated herein verbatim.

76. Prior to his sexual harassment of MCELROY and TROUP, SIFRE would brag to the members of the RNU that he had been investigated by the RPD Internal Affairs Division over a dozen times and he was never punished or disciplined because of he was a close, personal friend of SOTO.

77. SIFRE'S acts against MCELROY and TROUP as alleged herein were done intentionally, maliciously, and with the intent of oppressing MCELROY and TROUP. Accordingly,

MCELROY and TROUP seek an award of damages for the sake of example and by way of punishing SIFRE in accordance with NRS 42.005.

78. Because SOTO and RENO had advance knowledge that the SIFRE was unfit for the high profile assignment of being the Sergeant in charge of the RNU and assigned SIFRE to the position in violation of Nevada law and with a conscious disregard of the rights or safety of others, MCELROY and TROUP seek an award of damages for the sake of example and by way of punishing RENO in accordance with NRS 42.007.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiffs MCELROY and TROUP pray for judgment against Defendants as follows:

1. For an award of compensatory damages for the pain, suffering, humiliation, loss of enjoyment of work and life activities, stress, and emotional distress caused by Defendants' acts proven herein;
2. For an award of Punitive Damages pursuant to §102 of the Civil Rights Act of 1991.
3. For an award of Punitive Damages pursuant to Nevada State Law.
4. For an award of attorney's fees, witness fees, and other costs (42 U.S.C. §1988);
5. For interest on all damages awarded.
6. For any additional or further relief as may be just and proper.

## CERTIFICATION

The undersigned counsel certifies that this document does not contain any social security numbers or other personal identifying information.

DATED this 13th day of September, 2023.

By: /s/ Jack D Campbell
JACK D. CAMPBELL
Nevada State Bar #4938
418 River Flow Ct
Reno, Nevada 89519
*Attorney for Plaintiffs*